**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREA VITI, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SHATTUCK LABS, INC., TAYLOR SCHREIBER, ANDREW NEILL, JOSIAH HORNBLOWER, HELEN M. BOUDREAU, NEIL GIBSON, GEORGE GOLUMBESKI, MICHAEL LEE, TYLER BROUS, VICTOR STONE, CITIGROUP GLOBAL MARKETS INC., COWEN AND COMPANY, LLC, EVERCORE GROUP L.L.C., AND NEEDHAM AND COMPANY, LLC, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Andrea Viti ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things,

1

a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Shattuck Labs, Inc. ("Shattuck" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Shattuck securities: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Shattuck's October 2020 initial public offering (the "IPO" or "Offering"); and/or (2) between October 9, 2020 and November 9, 2021, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and violations of Sections 10(b) and  20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      On or about October 9, 2021, Defendants held the IPO, issuing approximately 13,664,704 shares to the investing public at $17.00 per share, pursuant to the Registration Statement.

3.      By the commencement of this action, the Company's shares trade significantly below the IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act and 28 U.S.C. §1331 and §27 of the Exchange Act.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District and §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Shattuck securities in this District.

## PARTIES

8.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased the Company's securities at artificially inflated prices pursuant to the IPO and during the Class Period and was damaged upon the revelation of the corrective disclosure.

9.      Defendant Shattuck purports to be a clinical-stage biotechnology company pioneering the development of bi-functional fusion proteins as a new class of biologic medicine for the treatment of cancer and autoimmune disease. The Company's programs include SL-172154 (SIRPα-Fc-CD40L) and SL-279252 (PD1-Fc-OX40L).

10.     The Company is incorporated in Delaware and its head office is located at 500 W. 5th Street, Suite 1200, Austin, Texas 78701. Shattuck securities trade on the NASDAQ under the ticker symbol "STTK."

11.     Defendant Taylor Schreiber ("Schreiber") is a co-founder of the Company and, at the time of the IPO and throughout the Class Period, was the Company's Chief Executive Officer and a Director.

12.     Defendant Andrew Neill ("Neill") was at the time of the IPO the Company's Vice President of Finance and Corporate Strategy and since March 2021 has served as the Company's Chief Financial Officer.

13.     Defendant Josiah Hornblower ("Hornblower") is a co-founder of the Company and, at the time of the IPO and throughout the Class Period until October 2021, was the Company's Executive Chairman and Director

14.     The Defendants named in ¶¶ 11-13 are sometimes referred to herein as the "Executive Defendants."

15.     Each of the Executive Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

16.     The Company is liable for the acts of the Executive Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Executive Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     Defendant Helen M. Boudreau was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

19.     Defendant Neil Gibson was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

20.     Defendant George Golumbeski was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

21.     Defendant Michael Lee was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

22.     Defendant Tyler Brous was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

23.     Defendant Victor Stone was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

24.     The Defendants named in ¶¶ 18-23 are sometimes referred to herein as the "Director Defendants."

25.     The Executive Defendants and the Director Defendants are sometimes referred to herein as the "Individual Defendants."

26.     Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Shattuck investors, all motivated by their own and the Company's financial interests.

27.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 390 Greenwich St, New York, NY 10013.

28.     Defendant Cowen and Company, LLC ("Cowen") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Cowen's address is 599 Lexington Avenue 20th Floor New York, NY 10022.

29.     Defendant Evercore Group L.L.C. ("Evercore") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Evercore's address is 55 E 52nd St, New York, NY 10055.

30.     Defendant Needham and Company, LLC ("Needham") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Needham's address is 250 Park Ave, New York, NY 10177.

31.     Defendants named in ¶¶ 27-30 are referred to herein as the "Underwriter Defendants."

32.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees from the IPO collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from the Company, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also obtained an agreement from the Company and the Individual Defendants that Shattuck would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the

Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)   In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management, and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company's would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

33.   The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

34.   35.   The Company, the Individual Defendants, and the Underwriter Defendants, are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
## Materially False and Misleading Statements

35.   On September 18, 2020, Shattuck filed with the SEC a registration statement on Form S-1, which in combination with subsequent amendments on Forms S-1/A and filed pursuant

to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.

36.     On October 13, 2020, Shattuck filed with the SEC the final prospectus for the IPO on Form 424B4, which forms part of the Registration Statement. In the IPO, Shattuck sold 13,664,704 shares at $17.00 per share.

37.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

38.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

39.     The Registration Statement emphasized the importance of Shattuck's August 8, 2017 collaboration agreement (the "Collaboration Agreement") with Millennium Pharmaceuticals, Inc., or Takeda, a wholly owned subsidiary of Takeda Pharmaceutical Company, Ltd. The Registration Statement states the following, in pertinent part, regarding SL-279252, Takeda, and the Collaboration Agreement:

> Since our founding in 2016, we have raised approximately $239.1 million through redeemable convertible preferred stock financings and non-dilutive partnership funds. Our key investors include Redmile Group, Fidelity Management and Research Company, Janus Henderson, EcoR1 Capital, Partner Fund Management, Avidity Partners, Hatteras Venture Partners, Emerson Collective, Piper Sandler & Co., JSR Corporation, *and Takeda*.
>
>             *        *        *
>
> Our second product candidate, SL-279252, which is being developed in collaboration with Takeda, has been rationally designed to simultaneously inhibit the PD-1/PD-L1 interaction and activate the OX40 receptor. We are evaluating SL-279252 in a Phase 1 clinical trial in patients with advanced solid tumors and

lymphoma, and we expect to announce data from the dose-escalation portion of this trial in the second half of 2021. …

We have funded our operations to date through the sale of redeemable convertible preferred stock for approximately $152.9 million, the issuance of convertible notes for approximately $10.5 million and ***payments received pursuant to our collaboration agreement with Takeda for approximately $75.7 million.***

          *     *     *

**Collaboration and License Agreements**

*Collaboration Agreement with Takeda*

On August 8, 2017, we entered into a Collaboration Agreement with Millennium Pharmaceuticals, Inc., or Takeda, a wholly owned subsidiary of Takeda Pharmaceutical Company, Ltd., or the Collaboration Agreement. The Collaboration Agreement was subsequently amended in April 2018, October 2018, and March 2020.

Pursuant to the Collaboration Agreement, we are required to use our commercially reasonable efforts to conduct preclinical and Phase 1 clinical trials for two molecules, PD-1-Fc-OX40L and CSF1R-Fc-CD40L, and Takeda has an exclusive option to license one or both of these clinical-stage ARC compounds for a specified amount of time up to and following the conclusion of each respective Phase 1 trial. …

Under the Collaboration Agreement, Takeda is granted a right of first negotiation to enter into licenses for each molecule within a specified class of ARC molecules. To exercise its right of first negotiation, Takeda will be required to provide a notice within a specified time, and if the parties do not conclude a license agreement within a set timeframe, we will be entitled to enter into licenses with third parties, subject to certain conditions.

***Thus far under the Collaboration Agreement, we have received approximately $75.7 million in option payments, milestone payments, and expense reimbursements from Takeda.*** If Takeda exercises its exclusive option to license one or both of the clinical-stage ARC compounds (PD-1-Fc-OX40L and CSF1R-Fc-CD40L), we will enter into a license agreement with Takeda with respect to such compound. ***Any such license agreement would, among other things, require Takeda to use its commercially reasonable efforts to develop the licensed compound and seek approval for the compound.*** In addition, ***Takeda would be solely responsible, at its costs, for the development, manufacture, and commercialization of the licensed ARC compounds. If both ARC compounds are licensed, we would be entitled to additional payments consisting of up to an aggregate of $78.75 million in license fee payments and up to an aggregate of $450 million in clinical, regulatory, and sales milestone payments. In addition, we would be eligible for tiered royalty payments*** on net sales of licensed products

at percentages ranging from the high single digits to sub-teens, subject to specified reductions, during the royalty term.

If Takeda exercises its option to enter into a license agreement, the royalty term with respect to the licensed product would extend, on a country-by-country basis, from the period commencing on the first commercial sale of the product in such country and ending on the later of (i) the expiration of the last to expire of the valid claims of the applicable licensed patent rights covering the product in such country or (ii) the tenth anniversary of the first commercial sale of the product in such country.

\*       \*       \*

**Components of our Results of Operation**

*Collaboration Revenue – Related Party*

***Pursuant to the Collaboration Agreement, we are eligible to receive up to $33.8 million if Takeda exercises options to enter into license agreements for SL-279252 and $45.0 million if Takeda exercises options to enter into license agreements for SL-115154.*** We are also entitled to receive reimbursements for certain materials and costs incurred in conjunction with research and development activities. ***We are further eligible to receive up to $450.0 million in additional fees if certain milestones are reached, and we are eligible to receive tiered royalties from the high single digits to the sub teens percentages based on annual worldwide net sales.***

***For the years ended December 31, 2018 and 2019 we received payments of $21.0 million and $8.5 million, respectively, and we received $11.3 million for the six months ended June 30, 2020. We have recognized total revenue of $48.2 million through June 30, 2020 under the Collaboration Agreement.***

We have no products approved for commercial sale and we have not generated any revenue from commercial product sales. ***Our total revenue to date has been generated solely from our collaboration agreement with Takeda. We expect to continue to recognize revenue under this agreement as development work is performed.*** We expect that any collaboration revenue we generate from our collaboration agreement with Takeda and any future collaboration partners will fluctuate from period to period as a result of the timing and the amount of milestones and other payments.

\*       \*       \*

*Clinical Development Strategy*

***In collaboration with Takeda, we are currently conducting a Phase 1 dose-escalation and dose-expansion trial of SL-279252 in patients with advanced solid tumors and lymphoma.***

\*       \*       \*

***SL-279252 Product Candidate***

The patent portfolio for our SL-279252 product candidate is based upon our owned and in-licensed patent portfolio, which includes patents and patent applications directed generally to compositions of matter, pharmaceutical compositions, and methods of treatment. We have two granted patents in the United States, from the in-licensed patent portfolio, covering compositions of matter of a genus of molecules, and the SL-279252 product candidate molecule specifically, pharmaceutical compositions, and methods of treating cancer. Patent applications are pending in the United States and various foreign jurisdictions and regions, including Australia, Brazil, Canada, China, Europe, Hong Kong, Indonesia, Israel, India, Japan, Korea, Mexico, Malaysia, Philippines, Russia, Saudi Arabia, Singapore, Thailand, Ukraine, and Vietnam. Patent applications in this family, if granted, are expected to expire in 2036, without taking potential patent term extensions or patent term adjustment into account.

Pending coverage, from the Company-owned patent portfolio, that relates to our SL-279252 product candidate also includes methods of treatment with various combination agents (one pending PCT application). Patent applications in this family, if granted, are expected to expire in 2039, without taking potential patent term extensions or patent term adjustment into account.

***Takeda holds an exclusive option to these patent families in connection with the Collaboration Agreement discussed elsewhere herein.***

*     *     *

***All of the Company's revenue is derived from its collaboration agreement with Takeda.***

*     *     *

***All of the Company's revenue is derived from its collaboration agreement with Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceuticals ("Takeda")***, a wholly owned subsidiary of Takeda Pharmaceutical Company Limited (see Note 8).

*     *     *

On March 31, 2020, the Company and Takeda entered into an amendment to the Collaboration Agreement (Amendment No. 3) which provided for a second dose expansion cohort for DM1, improvements to the DM1 process and manufacturing controls, certain administrative tasks and a non-refundable up-front payment applied to the to license fee for DM1 of $11.3 million. The Company can receive reimbursement for costs incurred in the performance of the second dose expansion cohort up to $3.2 million, plus fifty percent of out-of-pocket costs incurred by the Company for clinical trial materials for the first and second dose expansion cohorts up to $4.0 million and reimbursements of up to $1.6 million for costs related to improvement to the DM1 process and manufacturing controls.

(Emphasis added.)

40.     However, throughout the Registration Statement, Shattuck neglected to raise concerns about the related party Collaboration Agreement and its termination essentially one year later.

41.     Indeed, the Registration Statement implied that the Collaboration Agreement was solid and would aid the Company's funding needs, stating in relevant part:

> *We will require additional funding in order to complete development of our product candidates and commercialize our products, if approved. This additional financing may not be available on acceptable terms, or at all. If we are unable to raise capital when needed, we could be forced to delay, reduce, or eliminate our product development programs or commercialization efforts.*
>
> … Our future capital requirements will depend on many factors, including: …
> •      the progress of our collaboration with Takeda to develop product candidates; …
> •      the extent to which we acquire or invest in business, products, and technologies, including our collaboration with Takeda and any other licensing or collaboration arrangements for any of our product candidates. …
>
> Until such time, if ever, as we can generate substantial product revenues, we expect to finance our operations with our existing cash and cash equivalents and short-term investments, the net proceeds from this offering, equity or debt financings, and upfront and milestone and royalties payments, if any, received under our collaboration with Takeda and any other future licenses or collaborations.
>
>           *      *      *
>
> **Our Strategy**
>
> … Key elements of our strategy include: …
> • **Collaborating with leading biopharmaceutical companies.** *Similar to our collaboration agreement with Takeda, we intend to broaden the global reach of our bi-functional fusion protein platforms by selectively collaborating with leading biopharmaceutical companies.* We intend to retain significant economic and commercial rights to our programs in key geographic areas that are core to our long-term strategy.
>
> (Emphasis added.)

42.     The statements contained in ¶¶ 39-41 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly

13

disregarded by them. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (1) the Collaboration Agreement with Takeda was not solid; (2) Takeda and Shattuck would "mutually agree" to terminate the Collaboration Agreement in essentially one year; (3) as a result, Shattuck would cease to receive any future milestone, royalty, or other payments from Takeda; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

43.     On November 13, 2020, Shattuck filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 Report") which was signed by Defendants Schreiber and Neill. Attached to the Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schreiber and Neill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

44.     The 3Q20 Report stated the following, in pertinent part, about Takeda and the Collaboration Agreement:

> ***All of the Company's revenue is derived from its collaboration agreement with Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceutical Company Limited*** (see Note 8).
>
> \*       \*       \*
>
> The Company received payments of $8.5 million and $12.1 million in the periods ended September 30, 2019 and 2020, respectively, and recognized total revenue of $50.6 million through September 30, 2020 under the Collaboration Agreement. …
>
> On March 31, 2020, the Company and Takeda entered into an amendment to the Collaboration Agreement (Amendment No. 3) which provided for a second dose expansion cohort for DM1, improvements to the DM1 process and manufacturing controls, certain administrative tasks and a non-refundable up-front payment applied to the license fee for DM1 of $11.3 million. The Company can receive reimbursement for costs incurred in the performance of the second dose expansion cohort up to $3.2 million, plus fifty percent of out-of-pocket costs incurred by the Company for clinical trial materials for the first and second dose expansion cohorts

up to $4.0 million and reimbursements of up to $1.6 million for costs related to improvement to the DM1 process and manufacturing controls.

*     *     *

We have funded our operations as of the filing date of this quarterly report through the proceeds of our initial public offering for approximately $213.5 million (subsequent to September 30, 2020 and not reflected in financial statements), the sale of redeemable convertible preferred stock for approximately $152.9 million, the issuance of convertible notes for approximately $10.5 million and *payments received pursuant to our collaboration agreement with Takeda for approximately $76.5 million*.

*     *     *

**Collaboration and License Agreements**

*Collaboration Agreement with Takeda*

On August 8, 2017, we entered into a Collaboration Agreement with Millennium Pharmaceuticals, Inc., or Takeda, a wholly owned subsidiary of Takeda Pharmaceutical Company, Ltd., or the Collaboration Agreement. The Collaboration Agreement was subsequently amended in April 2018, October 2018, and March 2020.

Pursuant to the Collaboration Agreement, we are required to use our commercially reasonable efforts to conduct preclinical and Phase 1 clinical trials for two molecules, SL-279252 and SL-115154, and Takeda has an exclusive option to license one or both of these clinical-stage ARC molecules for a specified amount of time up to and following the conclusion of each respective Phase 1 trial. While we are currently evaluating SL-279252 in a Phase 1 clinical trial, we have not yet conducted a Phase 1 clinical trial for SL-115154. During the development phase of the Collaboration Agreement, we may not, by ourselves or through a third party, develop or commercialize a compound, molecule or product that targets both PD-1 and OX40L, or a compound, molecule or product that targets both CSF1R and CD40L. …

Under the Collaboration Agreement, Takeda is granted a right of first negotiation to enter into licenses for each molecule within a specified class of ARC molecules. To exercise its right of first negotiation, Takeda will be required to provide a notice within a specified time, and if the parties do not conclude a license agreement within a set timeframe, we will be entitled to enter into licenses with third parties, subject to certain conditions.

**Thus far under the Collaboration Agreement, we have received approximately $76.5 million in option payments, milestone payments, and expense reimbursements from Takeda.** If Takeda exercises its exclusive option to license one or both of the clinical-stage ARC molecules (SL-279252 and SL-115154), we will enter into a license agreement with Takeda with respect to such compound. Any such license agreement would, among other things, require Takeda to use its

15

commercially reasonable efforts to develop the licensed compound and seek approval for the compound. In addition, Takeda would be solely responsible, at its costs, for the development, manufacture, and commercialization of the licensed ARC molecules. ***If both ARC molecules are licensed, we would be entitled to additional payments consisting of up to an aggregate of $78.8 million in license fee payments and up to an aggregate of $450 million in clinical, regulatory, and sales milestone payments. In addition, we would be eligible for tiered royalty payments*** on net sales of licensed products at percentages ranging from the high single digits to sub-teens, subject to specified reductions, during the royalty term.

If Takeda exercises its option to enter into a license agreement, the royalty term with respect to the licensed product would extend, on a country-by-country basis, from the period commencing on the first commercial sale of the product in such country and ending on the later of (i) the expiration of the last to expire of the valid claims of the applicable licensed patent rights covering the product in such country or (ii) the tenth anniversary of the first commercial sale of the product in such country.

*     *     *

***Collaboration Revenue – Related Party***

***Pursuant to the Collaboration Agreement, we are eligible to receive up to $33.8 million if Takeda exercises options to enter into license agreements for SL-279252 and $45.0 million if Takeda exercises options to enter into license agreements for SL-115154.*** We are also entitled to receive reimbursements for certain materials and costs incurred in conjunction with research and development activities. ***We are further eligible to receive up to $450.0 million in additional fees if certain milestones are reached, and we are eligible to receive tiered royalties*** from the high single digits to the sub teens percentages based on annual worldwide net sales.

***We received $12.1 million for the nine months ended September 30, 2020. We have recognized total revenue of $50.6 million through September 30, 2020 under the Collaboration Agreement.***

We have no products approved for commercial sale, and we have not generated any revenue from commercial product sales. ***Our total revenue to date has been generated solely from our Collaboration Agreement with Takeda. We expect to continue to recognize revenue under this agreement as development work is performed.*** We expect that any collaboration revenue we generate from our collaboration agreement with Takeda and any future collaboration partners will fluctuate from period to period as a result of the timing and the amount of milestones and other payments.

(Emphasis added.)

45.     On March 16, 2021, Shattuck filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report") which was signed by Defendants Schreiber and Neill. Attached to the 2020 Annual Report were SOX certifications signed by Defendants Schreiber and Neill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

46.     The 2020 Annual Report stated the following, in pertinent part, regarding Takeda and the Collaboration Agreement:

**Our Strategy**
Our goal is to become the world leader in the discovery, development, and commercialization of dual-sided, bi-functional fusion proteins for the treatment of cancer and autoimmune diseases. … Key elements of our strategy include: …

- **Collaborating with leading biopharmaceutical companies.** Similar to our collaboration agreement with Takeda, we intend to broaden the global reach of our bi-functional fusion protein platforms by selectively collaborating with leading biopharmaceutical companies. We intend to retain significant economic and commercial rights to our programs in key geographic areas that are core to our long-term strategy.

                    *        *        *

*Clinical Development Strategy*
***In collaboration with Takeda, we are currently conducting a Phase 1 dose-escalation and dose-expansion trial of SL-279252 in patients with advanced solid tumors and lymphoma.***

                    *        *        *

***Collaboration Agreement with Takeda***
On August 8, 2017, we entered into a Collaboration Agreement with Millennium Pharmaceuticals, Inc., or Takeda, a wholly owned subsidiary of Takeda Pharmaceutical Company, Ltd., or the Collaboration Agreement. The Collaboration Agreement was subsequently amended in April 2018, October 2018, and March 2020.

Pursuant to the Collaboration Agreement, we are required to use our commercially reasonable efforts to conduct preclinical and Phase 1 clinical trials for two molecules, PD-1-Fc-OX40L and CSF1R-Fc-CD40L, and Takeda has an exclusive option to license one or both of these clinical-stage ARC compounds for a specified amount of time up to and following the conclusion of each respective Phase 1 trial. While we are currently evaluating PD-1-Fc-OX40L in a Phase 1 clinical trial, we have not yet conducted a Phase 1 clinical trial for CSF1R-Fc-CD40L. During the development phase of the Collaboration Agreement, we may not, by ourselves or

through a third party, develop or commercialize a compound, molecule, or product that targets both PD-1 and OX40L, or a compound, molecule, or product that targets both CSF1R and CD40L.

Further, pursuant to the Collaboration Agreement, we agreed to conduct certain preclinical studies on four additional preclinical ARC molecules, and Takeda had an option to license up to two of the four preclinical molecules. We completed our research and development activities related to the four preclinical molecules and delivered a final report to Takeda. Takeda elected to not exercise this option, and Takeda's option period for such molecules has now lapsed. As a result, the Collaboration Agreement is terminated as to the four preclinical molecules and Takeda does not have any rights to participate in the development or commercialization of such molecules.

Under the Collaboration Agreement, Takeda is granted a right of first negotiation to enter into licenses for each molecule within a specified class of ARC molecules. To exercise its right of first negotiation, Takeda will be required to provide a notice within a specified time, and if the parties do not conclude a license agreement within a set timeframe, we will be entitled to enter into licenses with third parties, subject to certain conditions.

***As of December 31, 2020, under the Collaboration Agreement, we have received approximately $78.4 million in option payments, milestone payments, and expense reimbursements from Takeda.*** If Takeda exercises its exclusive option to license one or both of the clinical-stage ARC compounds (PD-1-Fc-OX40L and CSF1R-Fc-CD40L), we will enter into a license agreement with Takeda with respect to such compound. Any such license agreement would, among other things, require Takeda to use its commercially reasonable efforts to develop the licensed compound and seek approval for the compound. In addition, Takeda would be solely responsible to use its commercially reasonable efforts, at its cost, to develop, manufacture, and commercialize the licensed ARC compounds. ***If both ARC compounds are licensed, we would be entitled to additional payments of up to an aggregate of $450 million in clinical, regulatory, and sales milestone payments. In addition, we would be eligible for tiered royalty payments*** on net sales of licensed products at percentages ranging from the high single digits to sub-teens, subject to specified reductions, during the royalty term.

If Takeda exercises its option to enter into a license agreement, the royalty term with respect to the licensed product would extend, on a country-by-country basis, from the period commencing on the first commercial sale of the product in such country and ending on the later of (i) the expiration of the last to expire of the valid claims on the applicable licensed patent rights covering the product in such country or (ii) the tenth anniversary of the first commercial sale of the product in such country.

\*     \*     \*

***SL-279252 Product Candidate***

18

The patent portfolio for our SL-279252 product candidate is based upon our owned and in-licensed patent portfolio, which includes patents and patent applications directed generally to compositions of matter, pharmaceutical compositions, and methods of treatment. We have two granted patents in the United States, from the in-licensed patent portfolio, covering compositions of matter of a genus of molecules, and the SL-279252 product candidate molecule specifically, pharmaceutical compositions, and methods of treating cancer. Patent applications are pending in the United States and various foreign jurisdictions and regions, including Australia, Brazil, Canada, China, Europe, Hong Kong, Indonesia, Israel, India, Japan, Korea, Mexico, Malaysia, Philippines, Russia, Saudi Arabia, Singapore, Thailand, Ukraine, and Vietnam. Patent applications in this family, if granted, are expected to expire in 2036, without taking potential patent term extensions or patent term adjustment into account.

Takeda holds an exclusive option to these patent families in connection with the Collaboration Agreement discussed elsewhere herein.

\*       \*       \*

Since our inception in 2016, we have devoted substantially all of our resources to developing and perfecting our intellectual property rights, conducting research and development activities, including undertaking preclinical studies of our product candidates, conducting clinical trials of our most advanced product candidates, manufacturing our product candidates, organizing and staffing our company, business planning, and raising capital. We do not have any products approved for sale, and we have not generated any revenue from product sales. We have funded our operations as of the filing date of this Annual Report on Form 10-K through the net proceeds of our initial public offering for approximately $213.5 million, the sale of redeemable convertible preferred stock for approximately $152.9 million, the issuance of convertible notes for approximately $10.5 million and *payments received pursuant to our collaboration agreement with Takeda for approximately $78.4 million*.

\*       \*       \*

## Collaboration Agreement

### Collaboration Agreement with Takeda

On August 8, 2017, we entered into a Collaboration Agreement with Millennium Pharmaceuticals, Inc., or Takeda, a wholly owned subsidiary of Takeda Pharmaceutical Company, Ltd., or the Collaboration Agreement. The Collaboration Agreement was subsequently amended in April 2018, October 2018, and March 2020.

Pursuant to the Collaboration Agreement, we are required to use our commercially reasonable efforts to conduct preclinical and Phase 1 clinical trials for two molecules, SL-279252 and SL-115154, and Takeda has an exclusive option to license one or both of these clinical-stage ARC molecules for a specified amount of time up to and following the conclusion of each respective Phase 1 trial. While we are currently evaluating SL-279252 in a Phase 1 clinical trial, we have not yet

conducted a Phase 1 clinical trial for SL-115154. During the development phase of the Collaboration Agreement, we may not, by ourselves or through a third party, develop or commercialize a compound, molecule or product that targets both PD-1 and OX40L, or a compound, molecule or product that targets both CSF1R and CD40L. Additionally, under the Collaboration Agreement, Takeda is granted a right of first negotiation to enter into licenses for each molecule within a specified class of ARC molecules.

*As of December 31, 2020, under the Collaboration Agreement, we have received approximately $78.4 million in option payments, milestone payments, and expense reimbursements from Takeda, which includes an $11.3 million non-refundable up-front payment applied to the license fee for SL-279252.* Pursuant to the Collaboration Agreement, we are eligible to receive up to an additional $33.8 million if Takeda exercises options to enter into license agreements for SL-279252 and $45.0 million if Takeda exercises options to enter into license agreements for SL-115154. If Takeda exercises its exclusive option to license one or both of the clinical-stage ARC molecules (SL-279252 and SL-115154), each license agreement would, among other things, require Takeda to be solely responsible to use its commercially reasonable efforts, at its cost, to develop, manufacture, and commercialize the licensed ARC molecules. *If both ARC molecules are licensed, we would be entitled to additional payments of up to an aggregate of $450 million in clinical, regulatory, and sales milestone payments. In addition, we would be eligible for tiered royalty payments* on net sales of licensed products at percentages ranging from the high single digits to sub-teens, subject to specified reductions, during the royalty term.

\*     \*     \*

### Collaboration Revenue – Related Party

We have no products approved for commercial sale, and we have not generated any revenue from commercial product sales. *Our total revenue to date has been generated solely from our Collaboration Agreement with Takeda. We expect to continue to recognize revenue under this agreement as development work is performed.* We expect that any collaboration revenue we generate from our Collaboration Agreement with Takeda and any future collaboration partners will fluctuate from period to period.

We have received cash of $14.0 million and $8.5 million for the years ended December 31, 2020 and 2019, respectively, from Takeda under the Collaboration Agreement. We have recognized total aggregate revenue of $51.9 million through December 31, 2020 under the Collaboration Agreement.

\*     \*     \*

Since our inception, our primary sources of liquidity have been generated through our Collaboration Agreement with Takeda and by sales of our preferred stock and common stock, including our IPO. As of December 31, 2020, we had an accumulated deficit of $72.1 million and $335.4 million of cash and cash equivalents and short-term investments.

\*     \*     \*

20

*All of the Company's revenue is derived from its collaboration agreement with Millennium Pharmaceuticals, Inc., a wholly owned subsidiary of Takeda Pharmaceutical Company Limited ("Takeda")* (see Note 8).

\*       \*       \*

*The Company received payments of $14.0 million and $8.5 million in the years ended December 31, 2020 and 2019, respectively, and has recognized total revenue of $51.9 million through December 31, 2020 under the Collaboration Agreement.*

(Emphasis added.)

47.    The statements contained in ¶¶ 39-41 and 43-46 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Collaboration Agreement with Takeda was not solid; (2) Takeda and Shattuck would "mutually agree" to terminate the Collaboration Agreement in essentially one year; (3) as a result, Shattuck would cease to receive any future milestone, royalty, or other payments from Takeda; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

48.    On November 9, 2021, the Company issued a press release entitled "Shattuck Labs Reports Third Quarter 2021 Financial Results and Recent Business Highlights" which announced the termination of the Collaboration Agreement, stating in relevant part that:

*Shattuck and Takeda mutually agree to terminate Collaboration Agreement*; Shattuck regains rights to clinical-stage product candidate SL-279252

\*       \*       \*

*Corporate Updates*

- **Shattuck and Takeda Mutually Agree to Termination of Collaboration Agreement:** *In November 2021, Shattuck and Takeda mutually agreed to*

21

***termination of the Collaboration Agreement for SL-279252 and SL-115154***, originally executed in 2017. Shattuck is no longer required to satisfy any remaining performance obligations, ***the Company will not make any payments to or receive any future milestone or royalty payments from Takeda***, and all options to license and rights of first negotiation held by Takeda under the Collaboration Agreement were terminated.

(Emphasis added.)

49.     On this news, Company's share price fell $5.45 per share, or 28%, to close at $13.59 per share on November 9, 2021, on unusually heavy trading volume.

50.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, Shattuck's share price has fallen significantly below its IPO price, damaging Plaintiff and Class members. On January 28, 2021, the Company's share price closed at $6.13 per share.

51.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

52.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the

officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(e)     whether Defendants violated the federal securities laws;

(f)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(g)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(h)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(i)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(j)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(k)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and;

to what extent the members of the Class have sustained damages and the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violation of Section 11 of the Securities Act
### Against All Defendants

59.     Plaintiff incorporates all the foregoing by reference.

60.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

61.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

62.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

63.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

64.      By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

65.     Plaintiff acquired the Company's securities pursuant to the Registration Statement.

66.     At the time of their purchases of Shattuck securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

67.      This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT II
### Violation of Section 12(a)(2) of the Securities Act
### Against the All Defendants

68.     Plaintiff incorporates all the foregoing by reference.

69.     By means of the defective Registration Statement, Defendants promoted, solicited, and sold Shattuck securities to Plaintiff and other members of the Class.

70.     The Registration Statement for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the

statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

71.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Registration Statement at the time Plaintiff acquired Shattuck securities.

72.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Shattuck securities pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

73.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT III
### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

74.     Plaintiff incorporates all the foregoing by reference.

75.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

76.     The Individual Defendants were controlling persons of Shattuck by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company. The Company controlled the Individual Defendants and all of Shattuck employees.

77.     The Company and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

78.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT IV
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against Defendant Shattuck and the Executive Defendants**

79.     Plaintiff incorporates all the foregoing by reference.

80.     This Count is asserted against the Company and the Executive Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.     During the Class Period, Defendants Shattuck and the Executive Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements

specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants Shattuck and the Executive Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

83.     Defendants Shattuck and the Executive Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

84.     The Executive Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

85.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Executive Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Executive Defendants' false and misleading statements.

86.    Had Plaintiff and the other members of the Class been aware that the market price of Shattuck securities had been artificially and falsely inflated by the Company's and the Executive Defendants' misleading statements and by the material adverse information which the Company and the Executive Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

87.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

88.    By reason of the foregoing, the Company and the Executive Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of The Exchange Act
### Against the Executive Defendants

89.    Plaintiff incorporates all the foregoing by reference.

90.    During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

91.    As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

92.    Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Executive Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

93.    The Executive Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or directors of the Company, they had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Executive Defendants exercised control

over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

94.    By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 31, 2022                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

31